## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:19 CR 36

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| BILLY RAY GARNER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 12), which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). The issues have been fully briefed, and the matter is ripe for ruling. Having carefully reviewed the evidence, the arguments, and applicable authority, the undersigned respectfully recommends that the Motion be denied.

## I. Relevant Procedural Background

A Bill of Indictment was filed on April 3, 2019 charging Defendant with violations of U.S.C. § 922(g)(1), 21 U.S.C. § 841(a)(1), and 18 U.S.C. 924(c)(1)(A). (Doc. 1).

On April 29, 2019, Defendant made an initial appearance during which counsel was appointed for him.

Arraignment and detention hearings were conducted on May 1, 2019. Defendant entered a plea of not guilty and waived his right to a detention hearing.

On May 29, 2019, Defendant filed the instant Motion to Suppress (Doc. 12) and a supporting brief (Doc. 13). The Government filed a response (Doc. 18) on June 28, 2019.

On August 19, 2019, the undersigned conducted an evidentiary hearing on the Motion. The Government called Ridge Phillips and Casey Lee, both of whom are detectives with the Avery County Sheriff's office. The Government also submitted Defendant's Pretrial Services Report (Doc. 7).

Defendant offered, without objection, the summary of an interview of a witness that was conducted on March 25, 2019 ("Interview Summary").[1] Defendant initially indicated he would testify but declined upon further consideration.

## II. Factual Background and Findings

On September 21, 2018, Detectives Lee and Phillips, along with three (3) other officers, were searching for an individual for whom they had an arrest warrant in connection with controlled substance charges. The detectives were wearing plain clothes and had badges on their waists. One or both of them had

---

[1] Upon a motion by Defendant, and without objection by the Government, this document was placed under seal.

a vest or jacket that was clearly marked with "Sheriff." The other officers were in uniform. All law enforcement personnel were carrying firearms on their belts, but they did not have long guns or body cameras.

The officers went to the suspect's residence, where they were told the suspect was not at home and had left on foot. The officers, who were in separate vehicles, then drove to 129 Almalene Drive ("Residence") approximately 250 yards away.

Detective Phillips testified that he smelled a strong odor of marijuana immediately upon exiting his vehicle, which was parked approximately 25 feet from the front door. Detective Lee also noticed the odor of marijuana as he took a few steps toward the house after exiting his vehicle. Both detectives testified regarding their abilities to identify the odor of marijuana.

Detectives Lee and Phillips then approached the Residence where they encountered Defendant.

The evidence is not clear as to which Detective was the first to speak with Defendant. Detective Lee testified that he knocked on the door, that Defendant answered, and that he asked Defendant if he could come inside. In response, Defendant allowed Detective Lee into the living room at which time Detective Lee advised Defendant that law enforcement personnel were looking for the suspect. Defendant responded that he had not seen the suspect.

3

Detective Lee then advised Defendant that he could smell the odor of marijuana.

Detective Phillips, however, testified that he was the first one to approach the door and that he knocked and announced he was with the Sheriff's office. Detective Phillips also testified that he explained to Defendant they were looking for the suspect and that he smelled the odor of marijuana coming from the Residence. After this brief introduction, Defendant invited Detective Phillips and Detective Lee into the Residence.

Once inside, Detective Phillips saw three (3) other individuals: 1) Leslie Martin, a male who was living in a back bedroom, 2) a female who approached from a back room, and 3) another female who was in the living room.

Detective Phillips spoke with Martin while Detective Lee spoke with Defendant. Detective Lee testified that he asked Defendant if the officers "could look around." Transcript ("Tr.") (Doc. 27) at 61. Defendant did not immediately agree but responded by asking Detective Lee what would happen if he did not allow the officers to conduct a search. Detective Lee advised Defendant that the officers would secure the scene and apply for a search warrant based on the odor of marijuana.

During this conversation, Detective Lee did not place his hands on Defendant, threaten Defendant physically, or draw attention to his firearm.

Detective Lee recalled that Defendant was nervous, but he did not perceive Defendant as being under the influence of any impairing substance.

Detective Lee testified that Defendant provided consent after Detective Lee "explained to him what would happen" and Defendant had "thought about it." Tr. at 63. Detective Phillips did not overhear Detective Lee's conversation with Defendant but was able to observe them as they were speaking. Detective Phillips confirmed that Detective Lee did not place his hands on Defendant or threaten him physically.

Detective Lee then reported to the other officers that Defendant had consented to a search of the Residence. Neither Defendant nor any of the other occupants objected.

Detective Phillips asked Martin if law enforcement could search his room and Martin agreed. Detective Phillips then proceeded to Martin's room where he promptly found a used hypodermic needle, methamphetamine residue, a methamphetamine pipe, marijuana, and a marijuana pipe.

Meanwhile, Detective Lee and Defendant continued to talk in the living room. Detective Lee testified that Defendant was not agitated during this conversation and appeared to have "calmed down a little bit." Tr. at 67. They spoke about various topics, including Defendant's relationship with one of the women in the house. Defendant also volunteered information regarding his prior criminal history, including that he had served time in prison.

5

Defendant did not say anything to Detective Lee to indicate that he was withdrawing his consent to a search of the Residence. The other occupants did not participate in this conversation.

After some time, Detective Lee informed Defendant that he was going to join the search to "speed things up to get [the officers] out of his house sooner." Tr. at 67-68. Detective Lee then began searching the kitchen cabinets. Inside the first cabinet he opened, Detective Lee found scales and approximately three (3) baggies of methamphetamine. During this time, Defendant was seated on a couch in the adjoining living room where he was able to see Detective Lee.

Detective Lee then arrested Defendant and placed him in handcuffs. At approximately this same time, Detective Phillips returned to the living room. Tr. at 25.

Detective Lee then asked Defendant "if there was anything else [Detective Lee] needed to know about." Tr. at 70. Defendant responded, "You're going to find it anyway," walked into an adjoining bedroom, picked up a black bag, and handed it to Detective Lee. Id. at 70-71. A firearm, marijuana, baggies, some paraphernalia items were contained in the bag.

The other occupants were eventually arrested as well.

Detective Lee estimated that the officers were present at the Residence for approximately 45 minutes. During that period, none of the occupants

6

withdrew consent to the search or raised an objection to anything the officers did inside the Residence. Detective Lee testified that Defendant remained "generally cooperative throughout the encounter." Tr. at 77. It is undisputed that no firearms were drawn and that the officers did not have a search warrant.

## III. Legal Principles

### A. Findings of Fact

Findings of fact may be made by a district court when deciding a motion to suppress. See United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005). "When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir.1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993)).

### B. Consent to Search

Warrantless searches of a home are "presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "[T]he physical entry of the

home is the chief evil against which the wording of the Fourth Amendment is directed." Id. at 585 (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).

"Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches." United States v. Neely, 564 F.3d 346, 349-50 (4th Cir. 2009) (per curiam); accord Illinois v. Rodriquez, 497 U.S. 177, 181 (1990). "Consent to search is valid only if it was knowing and voluntary and courts assess validity based on the totality of the circumstances." Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001) (quotations omitted). That is, the defendant must "freely and intelligently give[] his unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." United States v. Vickers, 387 F.2d 703, 706 (4th Cir. 1967). Coercion invalidates consent, "no matter how subtly the coercion [is] applied." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973).

The factors to be reviewed include "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of the consent[.]" Id.

8

The Government has the burden of establishing, by a preponderance of the evidence, that valid consent to search was provided. <u>United States v. Buckner</u>, 473 F.3d 551, 554 (4th Cir. 2007). "[S]howing no more than acquiescence to a claim of lawful authority" does not satisfy the Government's burden. <u>Bumper v. North Carolina</u>, 391 U.S. 543, 549 (1968). If it appears that consent was not voluntarily given, then the consent is deemed invalid and the search is determined to be unreasonable. <u>Schneckloth</u>, 412 U.S. at 233.

### C.    Custodial Interrogation

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Consequently, before the Government may use statements obtained from a custodial interrogation of a defendant, he must be warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

## IV.    Discussion

Defendant makes the following arguments: 1) that the officers did not obtain lawful consent before searching the Residence; 2) that there were no exigent circumstances that justified a warrantless search of the Residence; and 3) that the officers violated Defendant's Fifth Amendment Rights by failing to

advise Defendant of his <u>Miranda</u> rights when they questioned him at the Residence.

## A. Consent to Search the Residence

A factual determination of whether consent to a search was given is "a related, but analytically distinct, issue" from whether consent was also voluntary as a matter of law. <u>United States v. Carter</u>, 300 F.3d 415, 423 (4th Cir. 2002) (per curiam).

### 1. Consent in Fact

As to the first inquiry, the Government argues that Defendant provided consent; Defendant denies doing so.

The Government's evidence on this point is not overwhelming. A written consent form was not presented to Defendant. The exchange between Detective Lee and Defendant was not captured on video or recorded in any way. The exchange was not overheard by any of the other officers on the scene, nor was Defendant asked to confirm his consent to any of the other officers.

Further, Detective Lee provided few details regarding the consent given by Defendant and did not recall the specific words Defendant used.

The Interview Summary states that Defendant asked the Detectives if they had a search warrant, that they replied in the negative but stated they could detain the occupants of the Residence until they obtained a warrant, and that Defendant told the Detectives they had to get a search warrant.

Nonetheless, the undersigned concludes the Government has met its burden. Detective Lee testified that Defendant provided his consent after the two men had "talked about it a little" and Defendant had "thought about it," Tr. at 62-63, and Defendant does not appear to dispute that he initially responded to Detective Lee by asking what would happen if he did not allow the officers to conduct a search.

Further, when Detective Lee advised the other officers that Defendant had provided consent, Defendant did not object or state that Detective Lee had misconstrued Defendant's position.

Similarly, at no time thereafter did Defendant (or any other occupant) attempt to withdraw consent or raise any objection to the search, including when Detective Lee began searching the kitchen cabinets where a set of scales and methamphetamine were found.

The information attributable to the witness in the Interview Summary is generally consistent with the testimony of the Detectives at the hearing, with the important exception that the Interview Summary indicates Defendant told the Detectives they had to get a search warrant. However, the Interview Summary also states that the witness was not present with Defendant during the entire incident. In addition, the Interview Statement is not a verified firsthand account but is a law enforcement report of statements

11

by the witness who is describing communications between Defendant and the Detectives on the day in question. The witness did not testify at the hearing.

## 2. Knowing and Voluntary Consent

The Government also argues that Defendant's consent was knowing and voluntary and that there is no evidence Defendant's will had been overborne. Defendant disagrees and contends that he did not consent knowingly and voluntarily because he was under the influence of marijuana.

On this question, the Government's evidence is more substantial. Defendant's interactions with Detective Lee indicate Defendant understood the situation before him. Defendant did not provide consent immediately and asked Detective Lee what would happen if he did not consent. Defendant received information from Detective Lee about his options and "thought about it" before providing consent.

The evidence regarding Defendant's characteristics, including his age, maturity, education, intelligence, and familiarity with police, also supports a conclusion that Defendant's consent was voluntary. See Lattimore, 87 F.3d at 650. Defendant conversed intelligently with Detective Lee, discussed his relationship with another occupant in the house, and voluntarily offered information regarding his previous history with the criminal justice system.

Likewise, the conditions under which Defendant's consent was given, including the conduct of the officers, the number of officers present, and the

duration of the encounter, do not suggest his consent was involuntary. See id. Detective Lee testified that the entire encounter lasted approximately 45 minutes. Though there were five (5) officers at the Residence, four (4) occupants were present during the search. In addition, there is no evidence that any of the officers engaged Defendant physically, threatened him, or drew attention to their firearms.

Defendant suggests that he was impaired at the time he was interacting with the officers, Tr. at 128, and there is some evidence that Defendant had been consuming marijuana. While Detective Phillips could not recall Defendant admitting to doing so, Detective Lee testified "someone in the residence admitted smoking" and he "believe[d] it was [Defendant]." Tr. at 42, 84. In addition, the Interview Summary indicates that Defendant told the Detectives he had smoked marijuana on the front porch of the Residence approximately one hour before they arrived and that a marijuana cigarette had been located in Defendant's ashtray.

However, no evidence was presented regarding the quantity of marijuana consumed by Defendant or regarding the time period over which it had been consumed.

Further, Detective Lee testified that he did not perceive Defendant as being impaired while speaking with him. Also, while methamphetamine was

found in the house, no evidence was presented that Defendant had been using it.

Consequently, the undersigned concludes that Defendant's consent was given knowingly and voluntarily.[2]

## B. Custodial Interrogation

The Government acknowledges that Defendant was in custody and had not been advised of his <u>Miranda</u> rights at the time Detective Lee asked Defendant "if there was anything else [he] needed to know about." The Government argues, however, that the question was acceptable under the public safety exception to <u>Miranda</u>.

The public safety exception "permits law enforcement officers to ask questions, without giving <u>Miranda's</u> prophylactic warnings, if doing so is necessary to protect the officers or the public from immediate danger." <u>United States v. Bell</u>, 901 F.3d 455, 478 at n. 2 (J. Wynn, dissenting) (4th Cir. 2018), cert. denied, 140 S. Ct. 123 (2019) (citing <u>United States v. Mobley</u>, 40 F.3d 688, 692 (4th Cir. 1994)). The exception "must be construed narrowly" and "applies only where there is 'an objectively reasonable need to protect the

---

[2] Defendant also contends there were no exigent circumstances that justified a warrantless search of the Residence. The Government has not argued this issue and has chosen instead to rely on its argument that consent was provided. As noted, the undersigned finds that valid consent was given. Should this finding be rejected, however, the undersigned would agree with Defendant that exigent circumstances did not exist to justify a warrantless search.

police or the public from an immediate danger associated with [a] weapon.'" United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994) (quoting New York v. Quarles, 467 U.S. 649, 659 n.8 (1984)).

The application of the public safety exception requires a fact intensive inquiry into the circumstances of a given case. See United States v. Patmon, No. CRIM.A. 3:05-00174, 2005 WL 2877739, at *2 (S.D.W. Va. Oct. 28, 2005). Consequently, cases applying the exception have reached varying conclusions. Compare United States v. Hill, 340 F. App'x 950 (4th Cir. 2009) (finding that the questioning of a defendant regarding the existence of a weapon in the defendant's apartment, which had not been secured, was properly admitted) and United States v. Thomas, 77 F. App'x 673 (4th Cir. 2003) (per curiam), cert. denied, 540 U.S. 1208 (2004) (mem.) (finding that where a defendant, in response to questions regarding the existence of drugs or weapons, directed officers to a firearm in his jacket and a bag of cocaine on a high chair, the firearm was properly admitted under the public safety exception and the cocaine under the inevitable discovery doctrine) with United States v. Mobley, 40 F.3d 688 (4th Cir. 1994) (finding that the public safety exception did not apply where a defendant answered the door unclothed, was arrested while federal agents made a security sweep of his residence, was given Miranda warnings, and was subsequently questioned about weapons) and United States v. Rosebar No. CIV.A. TDC-14-0484, 2015 WL 2398399 (D. Md. May 18, 2015)

15

(relying on <u>Mobley</u> and finding that the public safety exception did not apply where a large number of officers entered a defendant's apartment, conducted a security sweep, and questioned the defendant who was wearing a tank top and boxer shorts).

In the instant case, the undersigned finds the following circumstances to be significant at the moment Detective Lee questioned Defendant:

### 1. The Officers

Five (5) law enforcement officers were at the Residence, having come there not to execute an arrest warrant for Defendant or any of the other occupants, or to serve a search warrant, but while searching for a separate individual. The extent to which the officers accompanying Detectives Lee and Phillips were involved in the search of the house is unclear, but they apparently were inside the house at the time Defendant was questioned.

### 2. The Occupants

Four (4) occupants had been encountered inside the house. Defendant and Martin had given consent to searches of the Residence and Martin's room, respectively. Martin had accompanied Detective Phillips to his room without incident and had returned to the living room. Defendant was under arrest, in handcuffs, and seated on the couch. The other occupants were in the living room as well but were not handcuffed. <u>See</u> <u>United States v. Tyson</u>, 360 F. Supp. 2d 798, 809 n.14 (E.D. Va. 2005) (though handcuffed, suspect could have

16

attempted to recover firearm from a nearby undisclosed location). A security sweep of the Residence had not been performed.

### 3. The Discovery of Narcotics

While searching the kitchen cabinets, Detective Lee found scales and approximately three (3) baggies of methamphetamine. Detective Phillips had located a hypodermic needle, methamphetamine residue, a methamphetamine pipe, marijuana, and a marijuana pipe in Martin's room.

### 4. Suspicion of Drugs and Weapons

In <u>Mobley</u>, the Fourth Circuit stated in a footnote that "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to police or public; each case must be examined on its own facts to determine whether the deviation from the standard rule is justified by the totality of the circumstances in which the questioning takes place." 40 F.3d at 693, n.2; <u>see also</u> <u>Rosebar</u>, 2015 WL 2398399, at *4–5 (D. Md. May 18, 2015).

Here, Detective Lee and Detective Phillips testified about their experiences regarding the relationship between weapons and drug activity, and their expectations that weapons or other dangerous items could be located in the Residence.

17

However, at the time Detective Lee posed his question to Defendant, he also had information regarding Defendant's criminal history, which Defendant had volunteered. The Pretrial Services Report in this case indicates that Defendant has prior convictions for first-degree kidnapping (2004), conspiracy to commit robbery with a dangerous weapon (2004), possession of a firearm by a felon (2013), trafficking in opium or heroin (2014), and interference with an electronic monitoring device (2016). Detective Lee testified that Defendant "was talking about how he had been in prison before" and that Defendant told Detective Lee "about what had happened and why he went in." Tr. at 67. Though Detective Lee, at the hearing, did not recall further details, there is some evidence that on the day in question Detective Lee did have specific information about past serious criminal conduct by Defendant. See Rosebar, 2015 WL 2398399, at *5 (D. Md. May 18, 2015) (collecting cases).

Under these circumstances, the undersigned is persuaded that the public safety exception applies. The circumstances the officers initially encountered indicated that one or more occupants of the house may have been smoking marijuana. However, as the situation progressed and additional information was revealed, an objectively reasonable concern for the officers' safety arose. [3]

---

[3] The broad phrasing of Detective Lee's question has given the undersigned some pause; Detective Lee did not reference concerns for safety, nor did he limit the question to weapons or other items that could pose some danger to the officers or to the public. Nonetheless, such information would have been responsive to the

## C. Suppression of Evidence

Defendant requests that "the property seized as evidence as a result of the illegal search and seizure, all statements made in violation of <u>Miranda</u> and any subsequent evidence and any statements resulting from the illegal search and seizure" be suppressed. (Doc. 13) at 12 – 13.

Having determined that Defendant provided valid consent to a search of the Residence, the undersigned does not conclude that physical evidence obtained as a result of that search, including the methamphetamine and scales found in the kitchen cabinet, should be suppressed.

Similarly, because the public safety exception to <u>Miranda</u> applied to Detective Lee's question to Defendant, suppression of Defendant's statement in response, as well as the firearm, marijuana, and drug paraphernalia in the bag that Defendant handed to Detective Lee, is likewise unwarranted.

In the alternative, if the previous recommendation were to be rejected and the public safety exception to <u>Miranda</u> deemed inapplicable, the undersigned would recommend that Defendant's statement be suppressed but

---

question, even though the question was broad enough to elicit other information as well. <u>See</u> <u>United States v. Williams</u>, 181 F.3d 945, 954, n. 13. (8th Cir. 1999). That is, though Detective Lee's question could have served investigatory as well as protective purposes, the undersigned is not convinced that Detective Lee was on an improper "fishing expedition." <u>See</u> <u>Mobley</u>, 40 F.3d at 693 ("Absent such circumstances posing an objective danger to the public or police, … the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety motivated the questioning that all understand is otherwise improper.").

that the firearm, drug paraphernalia, and marijuana in the bag Defendant retrieved not be suppressed, as the discovery of those items was inevitable.

"[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016). Here, in light of Defendant's consent to a search of the Residence as well as the discovery of narcotics, associated paraphernalia, and scales by Detectives Lee and Phillips in the kitchen and Martin's bedroom, a search of the separate bedroom where Defendant retrieved the bag that contained the firearm, drug paraphernalia, and marijuana, and the subsequent discovery of those items, was inevitable. See Thomas, 77 F. App'x at 674.

## V. Recommendation

Based on the foregoing, it is **RECOMMENDED** that Defendant's Motion to Suppress (Doc. 12) be **DENIED**.

Signed: December 5, 2019

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

21